BARHAM v. FEDERAL RESERVE BANK.

. Opinion delivered April 16, 1928.

1. FRAUDULENT CONVEYANCES—VOLUNTARY TRANSFER OF PROPERTY.— Where an insolvent debtor makes a voluntary transfer of property, not exempt, to those who are near of kin, whether he intends it as a fraud or not, it operates as a fraud on his creditors as a hindering, delaying or defeating them in the collection of their claims.

2. FRAUDULENT CONVEYANCES—HINDERING CREDITORS.—An insolvent debtor cannot take money which justly belong to his creditors and build a house, nor can he make a valid conveyance of his property for such purpose and thereby hinder and delay a creditor.

3. FRAUDULENT CONVEYANCES—PRESUMPTION OF FRAUD.—Convey-ances made to members of the household and near relatives of an embarrassed debtor are looked upon with suspicion and scrutinized with care, and if voluntary they are *prima facie* fraudulent, and when the embarrassment of the debtor proceeds to financial wreck, they are presumed conclusively to be fraudu-lent as to existing creditors.

4. FRAUDULENT CONVEYANCES—CONVEYANCE TO WIFE.—In a suit against a debtor to·have certain conveyances of his property set aside as fraudulent and subjected to payment of a judgment against the debtor, evidence *held* to support a decree of the chancellor that the title to certain property was in the debtor and not in his wife.

5. FRAUDULENT CONVEYANCES—EVIDENCE.—In a suit to have con-veyances set aside as fraudulent and to subject property to the payment of a judgment against a debtor, the circumstances developed in the case, the relation of the parties, and the credi-bility of the witnesses are all matters to be considered by the chancellor in determining all questions of fact.

6. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.— Findings of the chancellor will not be disturbed unless they are against the preponderance of the evidence.

Appeal from Crittenden Chancery Court; *J. M. Futrell,* Chancellor; affirmed.

*J. R. Pugh, Caraway, Baker & Gautney,* for appellant.

*R. V. Wheeler* and *S. V. Neely,* for appellee.

MEHAFFY, J.   The appellee, plaintiff below, had obtained a judgment against L. L. Barham in June, 1924, on which execution was issued December 24, 1924, and no property could be found upon which to levy the execution.

On February 5, 1925, this suit was begun in the Crittenden Chancery Court against L. L. Barham, Alma E. Barham, C. E. Barham and V. Lee Brunson. Plaintiff alleged that L. L. Barham was the owner of certain described property, that he executed a deed of trust, but that said deed was without consideration, and that it was made with the intent to prevent plaintiff and other creditors of L. L. Barham from collecting their debts. Plaintiff alleged that on September 7, 1923, L. L. Barham purchased certain property, but had it conveyed to his wife, and it was also alleged that other property was purchased by L. L. Barham and deeds made to his wife, and that all these deeds were made to the wife instead of to L. L. Barham for the purpose of hindering, delaying and defrauding the creditors of L. L. Barham. Plaintiff also alleged that L. L. Barham conveyed certain property to his daughter, V. Lee Brunson, for the purpose of defrauding creditors. It was sought to have these conveyances set aside as fraudulent and to subject the property to the payment of the judgment against L. L. Barham.

The answers of the defendants denied the material allegations of the complaint.

Plaintiff also alleged that certain other money was gotten by L. L. Barham and transferred to his wife, Alma E. Barham, in fraud of his creditors.

The defendant, L. L. Barham, testified, in substance, that Alma E. Barham was his wife, V. Lee Brunson his

daughter, and C. E. Barham his brother. That on December 21, 1923, he and his wife executed a deed of trust to C. E. Barham, conveying certain property in the town of Earle to secure the payment of a note to C. E. Barham. That C. E. Barham was in the lumber business at Marks, Mississippi, bought a lot, and erected a house for their mother, who is an invalid, and L. L. Barham was to pay one-half of the purchase price, and to pay the monthly bills incurred by his mother. Did not know the exact amount of the debt. The house was erected in 1917 and 1918 at a cost of about $4,000. Did not remember the price of the lot. He also testified that on September 7, 1923, W. W. Harrison conveyed certain property to Alma E. Barham. That Alma E. Barham and Mrs. Brunson opened a garage in the town of Earle. Prior to that time Brunson, the husband of V. Lee Brunson, and a man named Aldridge were in the garage business, and went into bankruptcy. Alma E. Barham and V. Lee Brunson then opened a garage with a capital of $2,000. The money used by Alma E. Barham was got from her father. The money with which Alma E. Barham purchased the property was money that her father gave her. The property where the gin is belongs to Mrs. Barham. The money was borrowed from the Federal Reserve Bank in witness' name. Witness insisted on his wife signing notes, but the cashier said it made no difference, and she did not sign them.

Witness' wife bought other property from J. C. Barham. Witness has not paid the money secured by the deed of trust to C. E. Barham, except two or three thousand dollars. Does not remember the date of the transfer of his stock in the Bank of Commerce to his son. It was in November, 1923. Conveyed his stock in the Crittenden County Bank & Trust Company to his son. Was a director and vice president of the Bank of Commerce after his stock was transferred.

Alma E. Barham owns property purchased from Nesbitt and others. The contract was made in 1924. Witness' wife furnished the money to make the payment.

Alma E. Barham also owns 160 acres south of Earle. This was bought in 1923, 80 acres of it, and the other early in 1924. She borrowed the money for the second 80-acre tract from the Joint Stock Loan Bank of Memphis. The money came from her father. She received between eight and ten thousand dollars from her father. Witness had been using part of it, and part of it was invested in Liberty bonds. Her money was in the Bank of Commerce at the time this property was purchased. Witness had authority to draw checks on Mrs. Barham's account. Alma E. Barham owns the gin. She bought it from the Continental Gin Company for $5,700, and had paid $3,000 out of moneys received from the operation of the gin. Witness made a statement of his financial condition to the Bank of Commerce in August, 1924. Does not know whether the statement shows that he had notes and trade acceptances amounting to $33,100. Made the statement to J. C. Moore, and insisted on him getting witness' wife to sign it. Told Mr. Moore that his wife owned the stuff. His wife's property consisted of bank stock, various notes, the details of which witness does not remember. Did not read the statement, and Mr. Moore filled it out. Signed it without reading it. Does not recall whether he had $31,100 of notes at that time or not. Does not recall that he had $2,800 in accounts receivable, and does not remember whether he made such statement. Did not have any live stock in 1924. In 1923 he possibly had 15 or 20 head, and sold them to various people.

The statement made by witness to the Bank of Commerce September 9, 1924, shows that he owns $8,000 stock in garage. Witness did not fill out the statement, and did not have the stock in the garage. Did not have anything in it. His wife owned it. While witness signed notes, he told Mr. Moore at the time it was his wife's debt, and insisted on her signing it, but Mr. Moore said it was not necessary. Witness does not know how much he owed the bank at that time. Made a statement in 1923,

but if he stated he owned anything in the garage it was wrong, for the garage was Alma E. Barham's. Possibly made a statement in 1924 that he was farming 2,000 acres. Other real estate valued at $5,000 refers to property in the town of Earle. Witness has his home, worth $6,300, in block 64. Statement shows $15,000 machinery, but witness does not know whether he owned that much at that time. Alma E. Barham bought the farming implements from witness' son and Albert Horner, and witness paid it for her out of her account; some money that her father gave her. Witness' wife put $2,000 in the garage and $3,000 in farming implements, and put $2,500 in land she bought; $1,200 in the land she bought from Barham and $1,200 in the gin. The home was in witness' name.

Witness does not own any automobiles. They belong to his wife. He had three or four cars in 1924, but sold them. The mortgage to the Joint Stock Land Bank is $6,500, and there are no other outstanding mortgages against the real estate. Made statement of assets and liabilities in 1923, but does not remember having made one in 1922. The statement shows witness worked 2,000 acres in 1923, but that is not true. Statement shows witness owned real estate, including residence, of the value of $18,100. Shows bank stock and stock in garage at $17,200, but that is not correct. Does not own the garage, and does not recall that that statement was made, and does not recall the total of the statement for 1923.

Witness made a deed to his daughter, and she has been in possession of the note since 1919 or 1920, and witness just failed to put the deed on record. Property witness had in 1923 was lost in the bank and in farming. Lost $20,000 in stock and deposits. Did not give his wife anything. Did not give her deed to property. Deeds were made direct from parties to her. Prior to 1923 did not think Mrs. Barham had an account with the Bank of Earle. She opened account in December, 1923. Witness had been using her money. They kept

his separate, but did not keep books. Witness' wife knew what her father had given her, and in 1920 witness erected a garage building and sold it for $25,000. At that time Mrs. Barham wanted her money, and they had a settlement, and she had around $10,000 then. She bought a section of land later and made about $6,000 profit. Witness' wife got a portion of the earnings. Mrs. Alma E. Barham's father is still living. Lives with witness. He is old and blind. Gave Alma E. Barham this money several years ago. He owned 160 acres of land in Mississippi, and sold it and gave his daughter, Alma E. Barham, $6,000. That dates back to 1905 or 1906. Then, after witness moved to Crittenden County, Alma E. Barham's father gave her some more money, $1,500 or $2,000. Up to that time witness' wife did not have any bank account. Witness had possession of the money all the time, and when it was in the bank it was in witness' name. The property was bought in witness' name, but he always consulted his wife. Witness' wife bought Liberty bonds in 1917, about $5,000 worth, and sold them in 1920 and put part of the money in the garage. Witness always assessed his wife's property. Prior to 1923 she never had any personal property. Does not think the garage was ever assessed, and Liberty bonds did not have to be assessed.

Witness' son looks after the gin, and signs Alma E. Barham's name to most of the checks. Witness signs but few checks himself. Does not owe the Bank of Commerce $3,000. That is a part of the bank's property. The agreement between the vice president and witness shows what the $3,000 was for. Witness had an agreement with the bank that the $3,000 was not an obligation, but that witness had title to the property for the bank.

W. F. McCorkle testified, in substance, that he is deputy State Bank Commissioner, and had charge of the records of the Bank of Commerce, at Earle. The bank failed November 29, 1924. The record shows loan to L. L.

Barham of $5,000 in August, 1924, note due November 12, 1924. The proceeds of the note were deposited to the credit of Alma E. Barham. Note of $4,000 discounted June 5, 1924, due October, 1924, was deposited to the credit of L. L. Barham, less the discount, and the proceeds on the same day were charged to L. L. Barham's account and credited to Alma E. Barham's account. On December 15 L. L. Barham had to his credit a balance of $3.26. The Federal Reserve Bank has the $4,000 note. The collateral pledged to secure the $4,000 note is shown by notation. In addition to the $4,000 and $5,000 notes, Barham owed the bank $3,044.55.

V. S. Fuqua testified that he is managing director of the Federal Reserve Bank of St. Louis, and was such in 1924. Received the $4,000 note executed by L. L. Barham to Bank of Commerce, and at the same time a statement signed by L. L. Barham, dated August 9, 1924. In October, 1924, Nesbitt and others made a contract with L. L. Barham to convey certain property at $40 an acre.

J. C. Moore testified, in substance, that he was connected with the Bank of Commerce of Earle until it closed. Had known L. L. Barham several years. Property known as Sallew property was conveyed to L. L. Barham. This property was conveyed to Barham, and he gave a note for the purchase price. But the payment shows that the note was not to be paid, but the property was held by Barham, and he was to make a deed to anybody the bank might designate. Witness did not think he put anything on the financial statement of Mr. Barham except what he furnished him. Does not remember that Barham told him that Mrs. Barham owned the property. Does not recall that Barham wanted Mrs. Barham to sign the statement.

J. R. Pugh, an attorney, testified, in substance, that in 1924 Barham came to his office with some negroes, and stated that they were selling property. Witness prepared a contract, and, after the contract was prepared showing that L. L. Barham was the purchaser, L. L.

Barham told witness that his wife was the purchaser, and he wanted the contract rewritten, and the deed was made later. It was made to Mrs. Barham. Does not remember how much was paid. Payments were made by check and by exchange. Barham gave witness a piece of Memphis exchange to Mrs. Alma E. Barham, and there was a check on the Parkin Bank by Mrs. Alma E. Barham.

W. W. Harris testified that he worked for Barham and Brunson as bookkeeper. Remembers Mrs. Barham receiving some money in 1923. She put in more money from the garage than she received.

J. C. Borum testified that he sold lots in Earle to Mrs. Barham in 1924. Was paid by check by Mrs. Barham, but does not remember the signature. The negotiations on the part of Mrs. Barham were made by L. L. Barham. He told witness that Mrs. Barham was the purchaser. She executed a trust deed to secure payment of the balance.

B. B. Brunson testified that he began the garage business in 1919 with L. L. Barham as his partner. Partnership existed seven or eight months. Had a falling out, and dissolved, and then a man named Aldridge and witness continued the business for two years and went into bankruptcy. After that, witness and Mrs. Barham started the business up. Witness and wife, who is the daughter of L. L. Barham, live in Earle, and own their property, and put the improvements on it after the lot was given to the wife. Mrs. Barham furnished the money to start the garage business.

The chancellor entered a decree, holding the transfers mentioned in pleadings and evidence fraudulent and void, except the conveyance to V. Lee Brunson of lot 4, block 64, was not void, and that V. Lee Brunson was the owner. Exceptions were saved, and appeal prosecuted to reverse said decree.

It is first insisted by the appellant that the court erred in declaring the deed of trust executed by L. L.

Barham and wife to Harris, trustee for C. E. Barham, to be without consideration, fraudulent, and void. It is insisted that the court erred, and that no witness was called to contradict Barham's statement. And that the only reason that suspicion is cast upon the act is due to the fact that the conveyance is to the brother of L. L. Barham. Appellant cites and relies on the case of *Martin* v. *Banks,* 89 Ark. 77, 115 S. W. 928. But in the Martin case both Mr. and Mrs. Martin testified and showed that, at the time of their marriage, Mrs. Martin had $1,600 derived from her father's estate. Martin failed in business, and went to work on a salary. Martin's testimony and that of his wife was that he devoted his earnings to the support of his family and invested Mrs. Martin's money for her. All of the investments were made in her name, and the property always kept in her name, and no mingling of her property with her husband's.

In the instant case Barham himself testified that his wife got property from her father, and that it dates back to 1905 and 1906, and that she never had any account in the bank. She did not handle the money. Barham kept it and used it himself. It is true, he says, that he consulted his wife about investments, but it was all done in his name, and she never had any account in the bank or any money in her own name until about the time the judgment was obtained against Barham. Her father, from whom it is claimed she received the money, is old and practically blind, and lives with his daughter. Mr. Barham, in his testimony, says that his brother is in the lumber business at Marks, Mississippi, and bought a lot and erected a house for their mother, and that witness agreed to pay one-half of it, and executed the deed of trust to secure the payment to his brother. But he also shows that the house was built in 1917 and 1918, and the deed of trust was made on December 21, 1923, about five or six years after the house was built. And the proof by Mr. Barham himself shows not only that, but that all of the business was conducted by him in his name prior

to this judgment which it is sought to collect. His statements show that he was worth in the neighborhood of $70,000.

"A man must be just to creditors before he can be generous to relatives. Therefore, where an insolvent debtor makes a voluntary transfer of his property, which is not exempt under the law from his debts, to those who are near of kin, whether he intends it as a fraud or not, it operates as a fraud on his creditors, for the reason that such a transfer hinders, delays or defeats them in the collection of their claims." *Davis* v. *Cramer*, 133 Ark. 224, 202 S. W. 239.

With reference to this particular transfer, while the evidence does not show when the lots were bought, nor for whom, nor how much they cost, nor in whose name they were held, it does show that the house was built in 1917 or 1918, and there is no reason or explanation of why it was not paid for at the time. Whether it is in the mother's name or the brother's, the evidence does not show. At any rate, an insolvent debtor could not take money which justly belonged to his creditors and build a house, nor could he make a valid conveyance of his property for such purpose and thereby hinder and delay his creditors.

"It is thoroughly settled in equity jurisprudence that conveyances made to members of the household and near relatives of an embarrassed debtor are looked upon with suspicion and scrutinized with care; and when they are voluntary they are *prima facie* fraudulent; and when the embarrassment of the debtor proceeds to financial wreck, they are presumed conclusively to be fraudulent as to existing creditors." *Harris* v. *Smith*, 133 Ark. 250, 202 S. W. 244.

It is also insisted by appellant that the court erred in declaring the title to the southwest quarter of the northwest quarter of section two and the southeast quarter of the northeast quarter of section three to be in L. L. Barham. This is the property about which Mr. Pugh

testified and for which he drew the contract. The contract was drawn in Mr. Barham's name, and afterwards he testifies that objection was made because of that, and the deed was made to Mrs. Barham. Mr. Barham himself testifies about this transfer. That it was bought some time early in 1924, and that his wife borrowed the money for the second 80-acre tract. And the other was paid by L. L. Barham with a draft on his wife's account, and that this money came from her father. But this was in the latter part of 1923 and the early part of 1924, and the money, according to his testimony, that she had received from her father was received five or six years before this, kept in his name all the time, and used and managed by him.

Transactions between husband and wife are scrutinized and examined with great care, and especially when the transactions affect the rights of creditors. Mrs. Barham herself does not testify. Neither does the father, and the only testimony with reference to receiving the money is by Mr. Barham, and, as to whether this tract of land was that of L. L. Barham or his wife was a question of fact, and we think the decree of the chancellor is supported by the preponderance of the evidence.

It is next insisted by appellant that the court erred in finding that L. L. Barham was the owner of lots 26 and 27 in block 13. This property was purchased in September, 1924, from John C. Borum, and L. L. Barham testifies that his wife borrowed the money, or he did for her, from the Federal Reserve Bank. It was borrowed in L. L. Barham's name, the notes were signed by him, and, until recently before this purchase, Mrs. Barham had had no bank account, did not keep her money in her name, and whatever money she had was kept in the name of L. L. Barham. And we think the testimony justified the chancellor in finding that this property was the property of L. L. Barham.

The testimony of the witnesses, the circumstances developed in the case, the relation of the parties and

the credibility of the witnesses are all matters to be considered by the chancellor in determining all questions of fact. And, where the findings of the chancellor are not against the preponderance of the evidence, they will not be disturbed on appeal. *Watkins* v. *Parker*, 81 Ark. 609, 99 S. W. 1106; *Hyner* v. *Bordeaux*, 129 Ark. 120, 195 S. W. 3; *McKinney* v. *New Rocky Grocery Co., ante,* p. 463.

While the trial in this court is *de novo,* yet the findings of a chancellor will not be disturbed unless they are against the preponderance of the evidence. And in this case we think the findings of the chancellor are supported by a preponderance of the evidence, and the decree is therefore affirmed.